UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

New Life Management
& Development, Inc.

    v.                                    Civil No. 11-cv-23-JL
                                   Opinion No. 2012 DNH 110

Hillcrest Manor, Inc.


**MEMORANDUM ORDER**

This contract dispute arises out of a consulting
relationship between the plaintiff, New Life Management &
Development, Inc., and its former client, defendant Hillcrest
Manor, Inc., which operates a retirement community in Manchester,
New Hampshire.  New Life claims that, after Hillcrest exercised
its right to terminate the parties' agreement, it pursued certain
improvements to the retirement community that New Life had
recommended (known, in consultant vernacular, as the "Phase II
and Phase III services"), obligating Hillcrest to pay New Life an
additional fee of $150,000 under the parties' contract.

Hillcrest denies that it has pursued those improvements.
Hillcrest further argues that, in any event, New Life is not
entitled to the fee because, first, the contract was terminated
by the parties' mutual agreement, rather than at Hillcrest's
election and, second, New Life breached the contract by failing
to provide other services due thereunder (known, again in

"consultant-speak," as the "Phase I deliverables").  This court
has jurisdiction over this state-law breach of contract action
between New Life, a New Jersey corporation with its principal
place of business there, and Hillcrest, a New Hampshire
corporation with its principal place of business here, under 28
U.S.C. § 1332(a)(1) (diversity).

New Life has moved for summary judgment, see Fed. R. Civ. P.
56, arguing that there is (a) no genuine dispute that, in fact,
Hillcrest has pursued the "Phase II or Phase III services,"
(b) no competent evidence to support Hillcrest's theory that the
parties mutually terminated the agreement, and (c) no basis for
Hillcrest to claim that New Life breached the agreement simply
because Hillcrest exercised its right to terminate before New
Life had provided the "Phase I deliverables."

This court agrees with New Life.  In relevant parts, the
agreement obligates Hillcrest to pay New Life "a monthly fee of
$10,000 until all Phase I deliverables have been achieved or
until such time as Hillcrest terminates the contract" and
provides that, if Hillcrest does so, it will pay an additional
$150,000 if it goes on to pursue the "Phase II or Phase III
services."  These provisions cannot be read to allow Hillcrest to
terminate the contract before the Phase I deliverables have been
achieved, then to invoke the fact that the Phase I deliverables

had not been achieved as the basis for refusing to pay New Life
for Hillcrest's pursuit of the Phase II or Phase III services.
Hillcrest has also failed to come forward with any competent
evidence supporting its contentions that the agreement was
mutually terminated or that it has not in fact pursued the Phase
II or Phase Services.  Accordingly, as fully explained below, New
Life's motion for summary judgment is granted.[1]

## I.   **Applicable legal standard**

Summary judgment is appropriate where "the movant shows that
there is no genuine dispute as to any material fact and the
movant is entitled to judgment as a matter of law." Fed. R. Civ.
P. 56(a).  A dispute is "genuine" if it could reasonably be
resolved in either party's favor at trial, and a fact is
"material" if it could sway the outcome of the trial under
applicable law.  See, e.g., Estrada v. Rhode Island, 594 F.3d 56,
62 (1st Cir. 2010).  Where, as here, "the party moving for
summary judgment bears the burden of proof on an issue, he cannot
prevail unless the evidence that he provides on that issue is
conclusive." EEOC v. Union Independiente de la Autoridad de

---

[1]This court's practice is to hear oral argument on all
dispositive motions, so long as at least one party wants to be
heard.  Here, both parties advised the court that they wanted it
to rule on the summary judgment motion without oral argument.

Acueductos y Alcantarillados de P.R., 279 F.3d 49, 55 (1st Cir. 2002) (internal quotation marks omitted).

In analyzing a summary judgment motion, the court must "view[] all facts and draw[] all reasonable inferences in the light most favorable to the non-moving party." Estrada, 594 F.3d at 62.  The following facts are set forth accordingly.[2]

## II.  **Background**

Hillcrest owns and operates the Hillcrest Terrace Retirement Community in Manchester.  In early 2007, it engaged New Life, which provides consulting services to retirement communities, to conduct a comprehensive assessment of Hillcrest and to make recommendations for improving its position in the marketplace and its financial performance.  Under a "Terms and Cost Agreement" between the parties, Hillcrest paid New Life $80,000 (plus expenses) for this assessment.

---

[2]Hillcrest objects to the affidavit of New Life's president submitted in support of New Life's summary judgment motion, arguing that she lacks personal knowledge of many of the facts to which she attests because they occurred prior to her involvement in New Life's dealings with Hillcrest.  See Fed. R. Civ. P. 56(c)(4) ("An affidavit . . . used to support a motion must be made on personal knowledge").  While this argument appears to have some merit, at least as to portions of the affidavit, the court need not reach it, because the court has not relied on the affidavit at all in deciding the motion.

The results of the assessment were set forth in a document entitled "Strategic Organizational Assessment & Review" and dated June 2007.  In this document, New Life recommended that Hillcrest "commence a three phase repositioning, expansion and revitalization program of its campus."  The document identified a number of initiatives comprising each of these phases.  As explained in the study's preliminary feasibility analysis:

> Phase I would encompass offering a Type A Lifecare entrance fee contract to residents moving into the existing independent living apartments . . . .

> Phase II would encompass the construction of 24 additional, higher end living apartments on the campus. The new construction would also include 4,000 square feet of common space.

> Phase III would encompass the construction of 48 independent living villas built as six 8-plex buildings with 6,000 square feet of common space.

The feasibility analysis explained that "[c]onstruction for Phase II . . . is assumed to be financed with tax-exempt bonds," but "[p]reconstruction costs for Phase II are expected to be paid with cash collected from entrance fees is [*sic*] Phase I."[3]  Under the "Lifecare entrance fee contracts" envisioned by the analysis, "residents will pay a one time, 90% refundable entrance fee and an ongoing monthly service fee."  (This was in contrast to the

---

[3]Under the analysis, "Phase II of the Project [was] assumed to require approximately $1.2 million of pre-construction capital."

model then in effect at Hillcrest, which, according to the study, offered "lower entry fees" and, as such, subjected the business to "greater financial strains," than typical facilities like it.) As part of Phase II, New Life also recommended that Hillcrest renovate the facility's main entrance and exercise its existing option to purchase an adjoining parcel, where the "independent living villas" would be built as part of Phase III.[4]

In August 2007, Hillcrest and New Life entered into a written agreement for Hillcrest "to engage the services of New Life to implement and perform the so-called Phase 1 services set forth and outlined in the Study, as more particularly set forth herein."  This agreement defined "the Study" as New Life's

---

[4]New Life claims that its Phase II recommendations also included "the addition of a bistro and pub as additional common space dining venues," relying on the study documents and the deposition transcript of the vice president in charge of New Life's work for Hillcrest.  The cited pages from these materials do not support that proposition, however.  While the study observes that "[s]maller formal dining rooms with larger casual dining venues such as bistros and pubs are increasing in size and should be considered for Hillcrest terrace," the study does not incorporate this recommendation into Phase II or, for that matter, any particular phase of the development (nor does the deponent's testimony, which was simply that New Life suggested that an informal cocktail lounge at the facility "should be greatly enhanced because it is very common in [such facilities] today . . . to develop even full pubs as part of their offering").  Because New Life has failed to provide any record support for, let alone conclusively establish, that adding a bistro or pub to Hillcrest was part of the "Phase II or Phase III services set forth and outlined in the Study," the court has not considered that assertion in its summary judgment ruling.

"comprehensive assessment of Hillcrest's management, marketing and physical plant and . . . recommendations for improving [its] position within the marketplace, census and financial performance."  Under the agreement, New Life was "responsible for providing and delivering" a number of specified services, known as "Project Deliverables."

The "Project Deliverables" included, in relevant part, that New Life "coordinate and be responsible for obtaining on behalf of Hillcrest approval by the State of New Hampshire" of both (1) the facility as "a Type A and Type C Continuing Care Retirement Community ("CCRC") including development of approval of all resident contracts and disclosure statements" and (2) the "conversion of the first floor of [the facility's] nursing center to new skilled nursing facility beds through the conversion of assisted living beds to meet the needs of on [*sic*] new so-called 'Type A' and 'Type C' CCRC resident [*sic*]."  The deliverables also included the development of both "a memory support care wing within assisted living" at the facility and a "transitional unit program on the third floor [of the facility] to help meet the needs of independent living residents who are in need of additional services, but are not yet in need of assisted living services," and the "[d]iscontinuance of low entry fee options."

The agreement further provided, in paragraph 6.1:

> As compensation for the services rendered hereunder, New Life shall be paid a monthly fee of $10,000 until all Phase I deliverables have been achieved or until such time as Hillcrest terminates this contract. Provided in no event, shall the compensation for the [*sic*] New Life's services, obligations and duties thereunder exceed $200,000.

Paragraph 8.1 called for the termination of the agreement upon one of a number of specified events, including

> (a) upon mutual written agreement of both parties, (b) by written notice from a non-defaulting party to a defaulting party if such party defaults in the performance of any material obligation or agreement under, or otherwise materially fails to comply with any provision of, this Agreement, and such default, failure, or breach shall not have been cured or remedied within . . . 30 calendar days for non-monetary defaults . . . ; or (d) either party may terminate this agreement upon forty-five (45) calendar days prior written notice for any reason or no reason whatsoever.

Paragraph 8.2 goes on to state that:

> If this Agreement is terminated by Hillcrest and within three (3) years of said termination Hillcrest subsequently pursues either so-called Phase II or Phase III services set forth and outlined in the Study without the services of New Life, Hillcrest agrees to pay New Life an additional fee of $150,000. This additional fee will not be subject to the fee limitations outlined in Paragraph 6.1 of the agreement.

Finally, the agreement states that "no waiver, alteration, modification, or termination of this agreement shall be valid unless made in writing and signed by both parties," and that it is governed by New Hampshire law.

8

Between August 2007 and February 2009, Hillcrest paid New Life a total of $180,000, consisting of 18 monthly payments, each in the amount of $10,000, as contemplated by the agreement. Hillcrest claims that, by the end of this time period, New Life had yet to provide a number of the "Project Deliverables" required by the agreement, viz., obtaining state approval of the conversion of the facility's first floor to "new skilled nursing facility beds," developing the "memory support care wing" or the "transitional unit program," or the discontinuance of "low entry fee options."  Hillcrest also claims that New Life had failed to provide another "Project Deliverable," namely, "obtain[ing] the life care contracts required to generate enough cash to reduce Hillcrest's debt and . . . to enable the project to move forward from Phase I to Phase II," but, on its face, the parties' written agreement nowhere obligated New Life to do that.[5]

In any event, Hillcrest claims that, by February 2009, "Hillcrest's financial condition [had] actually deteriorated"

---

[5]Hillcrest says that "the Project Deliverable which dealt with New Life's responsibility to obtain such contracts is set forth at paragraph 2.1(b)," but that provision requires New Life to obtain state approval of Hillcrest as a CCRC, "including development of approval of all resident contracts and disclosure statements."  It clearly does not require Hillcrest to obtain the contracts themselves, i.e., find people to agree to enter the facility.  Hillcrest provides no developed argument to the contrary.

compared to August 2007, "for reasons related to the downturn in the economy and the failure of New Life to provide the Project Deliverables" under the agreement.  Hillcrest did not, however, notify New Life that it had "default[ed] in the performance of any material obligation" under the agreement, as contemplated by paragraph 8.1(b).

Instead, according to an affidavit submitted by Hillcrest's president and CEO, Gary Zabierek, he and the chairperson of Hillcrest's board, Janet Bamberg, spoke by telephone with New Life's president, Mary McMullin.  During the call, Zaberiek says,

> both [Bamberg] and I discussed the status of the project and our belief that there was no sense in proceeding further under the terms of the agreement due to the continued deterioration of Hillcrest's financial condition and the impossibility of developing Phase II because of the absence of funds to do so.  Ms. McMullin did not disagree and commented that New Life and other organizations like Hillcrest had suffered from a downturn in the economy.  [She] agreed there was no purpose to continue under the terms of the agreement. As a result of that conversation both [Bamberg] and I believed the agreement had been mutually terminated. We gave no thought at that time to the need to reduce our agreement to writing nor did Ms. McMullin request that we do so.

Zabierek further attests that, during the same conversation, "the parties discussed their respective desires to maintain a relationship but in a reduced role and only for the provision of marketing services."  The parties reached an agreement, memorialized in a subsequent e-mail from McMullin to Zabierek,

10

that New Life would provide those services to Hillcrest "for a
minimum period of six (6) months at a monthly fee of $5,000
. . . . [T]his arrangement may be extended on a month to month
basis.  This fee replaces the current development fee of $10,000,
which is suspended until the project development is approved to
move forward."  The email says nothing about terminating the
August 2007 agreement, and Zabierek testified at his deposition
that there were no terms or understandings reached in his
conversation with McMullin that were not reflected in the email.
According to Zabierek, the parties operated under this
arrangement until around March 2010, when Hillcrest "terminated
the agreement for the provision of marketing services."

Zabierek's affidavit (and one to similar effect by Bamberg)
appear to represent the first time in this litigation, or during
the events leading up to it, that Hillcrest has claimed that its
August 2007 agreement with New Life was "mutually terminated."
When New Life eventually demanded payment of the $150,000 fee in
June 2010, "Hillcrest refused on the basis that all Phase I
activities had been discontinued back in March 2009," rather than
that the agreement had been mutually terminated.  Moreover,
Hillcrest's answer in this action does not assert that the call
producing McMullin's email resulted in a mutual termination of

the August 2007 contract, but that the email "changed the relationship of the parties from that formed by" that contract.

As of March 2010, around the time Hillcrest says the August 2007 agreement was terminated, Hillcrest had not begun work on any of the elements of Phase II or Phase III, as described in the documents New Life had provided as part of June 2007 study.  By April 2011, however, Hillcrest's website had announced "a multi-million dollar renovation and expansion . . . which will include a stunning new entrance and lobby . . . and a neighborhood of cottages designed for seniors who seek greater independence." Zabierek testified at his deposition that, as of November 2011, Hillcrest had begun construction of "a new front entrance" and exercised its option to purchase the adjoining parcel.  He also testified that, also as of that date, Hillcrest was "starting to build duplex cottages"--which he acknowledged "was contemplated under Phase III" of New Life's study.  Again, New Life has demanded that, because Hillcrest has pursued these improvements, it pay New Life the additional $150,000 fee under paragraph 8.2 of the August 2007 agreement, but Hillcrest has refused.

## III. **Analysis**

In moving for summary judgment, New Life argues that the foregoing facts leave no room for doubt that (A) Hillcrest

terminated the August 2007 agreement and (B) subsequently pursued at least some of the Phase II or Phase III services set forth and outlined in New Life's June 2007 study, obligating Hillcrest to pay New Life the additional fee of $150,000 under paragraph 8.2. Hillcrest disagrees with both of these propositions, and further argues that New Life is not entitled to the payment in any event because its failure to deliver the Phase I services amounted to a material breach of the agreement.  As discussed <u>infra</u>, there is no genuine issue of material fact going to whether Hillcrest terminated the agreement, or went on to pursue Phase II or Phase III services, nor did New Life's claimed failure to complete the Phase I services amount to a material breach of the August 2007 agreement.  Accordingly, New Life is entitled to summary judgment on its claim against Hillcrest.[6]

## A.    Hillcrest terminated the August 2007 agreement

As New Life emphasizes, Zaberiek admitted at his deposition, where he appeared as Hillcrest's designee under Rule 30(b)(6) of

---

[6]New Life is also entitled to summary judgment on Hillcrest's counterclaim, which asserts that it paid New Life "in excess of the $200,000 limit" set forth in the August 2007 agreement.  In support of its summary judgment motion, New Life has come forward with evidence that it was paid only $180,000 under the agreement.  Hillcrest does not dispute that fact in its objection, or otherwise address New Life's argument for summary judgment on the counterclaim.

the Federal Rules of Civil Procedure, that "Hillcrest terminated the agreement of August 2007."  He went on to explain that Hillcrest had terminated that agreement, which "had changed over a period of time," in 2010, when "there was no need for [New Life's] services going forward."  Indeed, he states in his affidavit submitted in opposition to New Life's summary judgment motion that "Hillcrest terminated the agreement for the provision of marketing services" in March 2010.

But Zaberiek's affidavit also attests that, as a result of their February 2009 telephone call with McMullin, the August 2007 agreement was mutually terminated.[7]  Though Hillcrest's briefing is unclear on this point, the position Zaberiek stakes out in his affidavit seems to be that, during the telephone call, the parties agreed to both a mutual termination of the August 2007 contract and an entirely new contract for New Life to provide Hillcrest with marketing services only.  But neither Zaberiek's account of the call, nor the substantially similar account that

---

[7]New Life argues that this statement in Zaberiek's affidavit amounts to an unexplained contradiction of his deposition testimony, just quoted, that Hillcrest terminated the agreement, and should therefore be disregarded in ruling on summary judgment.  See, e.g., Colantuoni v. Alfred Calacagni & Sons, Inc., 44 F.3d 1, 4-5 (1st Cir. 1994).  While this argument appears to have some merit, the court need not reach it because, as discussed infra, Zaberiek's affidavit, even if properly considered, fails to create a genuine issue of fact as to whether there was a mutual termination.

Bamberg gives in her affidavit, creates a genuine issue of fact as to whether the August 2007 agreement was mutually terminated.

As an initial matter, that agreement provides that no "termination of [it] shall be valid unless made in writing and signed by both parties," yet Zaberiek acknowledges that the claimed "mutual termination" was never reduced to writing.  It is true that "'[a]n express provision in a written contract that no rescission or variation shall be valid unless it too is in writing is ineffective to invalidate a subsequent oral agreement to the contrary.'" Prime Fin. Grp., Inc. v. Masters, 141 N.H. 33, 37 (1996) (quoting 3A Arthur Linton Corbin, Corbin on Contracts § 763, at 531 (1960)).  But "[t]his is not to say that in-writing provisions are wholly ineffective.  The finder of fact must first determine that the parties intended to waive the in-writing clause of the contract."  Id.

Here, after making that determination, the finder of fact would have to conclude further that New Life and Hillcrest actually reached an unwritten agreement to terminate the August 2007 contract.  See id.  While the mutual termination of a contract does not require "an express agreement to that effect," Wheeden v. Fiske, 50 N.H. 125, 129 (1870), it must satisfy the same requisites of contract formation as any other agreement, see Green Manor Constr. Co. v. Highland Painting Serv., Inc., 345

15

F.2d 657, 660 (1st Cir. 1965) (applying Massachusetts law).  So
"[a]n agreement to terminate a contract, like all agreements, is
not something which parties fall into unawares."  Id.

Hillcrest has not come forward with evidence from which a
rational trier of fact could conclude that New Life waived the
provision of the August 2007 contract requiring a "mutual written
agreement" to terminate it and reached an oral agreement to that
effect.  In support of its "mutual termination" theory, Hillcrest
relies solely on the statement from Zaberiek's affidavit (and the
similar statement from Bamberg's affidavit) in which they recount
telling McMullin "that there was no sense in proceeding further
under the terms of the" August 2007 contract and her "agree[ment]
that there was no purpose to continue under the terms of" that
contract.[8]  But it is undisputed that, in the very same
conversation, the parties reached an agreement that New Life
would continue to provide marketing services to Hillcrest "for a
minimum period of six (6) months at a monthly fee of $5,000," and
that "[t]his fee replaces the current development fee of $10,000,
which is suspended until the project development is approved to

_____

[8]Zaberiek and Bamberg also state that "[a]s a result of
[this] conversation, [we] believed the [August 2007] agreement
had been mutually terminated," but a party's subjective beliefs
"are insufficient to create an implied contract."  Durgin v.
Pillsbury Lake Water Dist., 153 N.H. 818, 821 (2006).

move forward."  It is also undisputed that the entirety of this agreement was memorialized in McMullin's March 1, 2009 email to Zaberiek--which says nothing about terminating the August 2007 agreement.  Instead, the email speaks of "replac[ing]" one of the provisions of that agreement, i.e., the $10,000 monthly fee.

In light of these undisputed facts, any rational trier of fact would have to conclude that, during the February 2009 call, the parties reached an agreement--later memorialized in McMullin's email--to modify the August 2007 contract by, in essence, extending its term while reducing the scope of New Life's services and the fees Hillcrest would pay for them.  No rational trier of fact could conclude that, instead, the exchange between Zaberiek and McMullin during their telephone conversation amounted to an agreement to terminate the August 2007 contract. Such a finding would be impossible to square with McMullin's email which, according to Zaberiek, memorializes the entirety of the agreement reached during the phone call yet says nothing about terminating the August 2007 contract.[9]

_____

[9]It is unclear from the materials presently before the court why Hillcrest--having already paid New Life $180,000 of the maximum $200,000 in fees for providing the deliverables due under the agreement--agreed to pay New Life at least $30,000 more for providing reduced services for the next six months, rather than simply paying the remaining $20,000 and insisting, in essence, that New Life work "for free" until the deliverables had been achieved.  In any event, as noted infra, this court cannot

17

This is to say nothing of the fact, of course, that it was not until Hillcrest filed its objection to the summary judgment motion that Hillcrest first claimed the parties had reached an agreement for mutual termination of the August 2007 contract. Again, in its answer, Hillcrest describes the agreement reflected in McMullin's email as having "changed the relationship of the parties from that formed by" the August 2007 contract--rather than as terminating that contract and making a new one, as Hillcrest now claims.  It is undisputed that Hillcrest terminated the August 2007 contract, as modified during the February 2009 telephone call, when it "terminated the agreement for the provision of marketing services" in 2010.  Hillcrest cannot avoid summary judgment by virtue of its mutual termination theory.

**B.   Hillcrest pursued Phase II services within three years of terminating the August 2007 contract**

It is also undisputed that, within three years of Hillcrest's termination of the August 2007 contract, Hillcrest had (a) commenced construction of "a new front entrance," (b) exercised its option to purchase the adjoining parcel, and

---

relieve parties of the agreements they have struck simply because those agreements seem unbalanced or unfair in retrospect.

(c) started to build duplex cottages.  As discussed above, New

Life had recommended in the study that, as part of Phase II,

Hillcrest (a) renovate the facility's main entrance and

(b) exercise its existing option to purchase an adjoining parcel.

New Life also recommended in the study, as part of Phase III,

that Hillcrest (c) build the duplex cottages.  Indeed, Zaberiek

admitted at his deposition that building the duplex cottages "was

contemplated under Phase III" of New Life's study.

Hillcrest nevertheless maintains that a genuine factual

dispute exists as to whether it "undertook to perform Phase II

and Phase III services," arguing that "there were many changes

from the time of the June 2007 'Study' to June 2008, when the

Master Plan was formulated."[10]  But the August 2007 agreement

---

[10]Hillcrest also states, in a single sentence in its summary judgment objection, that "Zabierek testified ad nauseum in [his] deposition . . . regarding the differences between what New Life outlined as Phase II and Phase III development and what Hillcrest has undertaken to date to perform," citing to several pages of his deposition transcript.  But Hillcrest did not submit any part of Zabierek's deposition transcript with its summary judgment filings.  While, as it turns out, some of the pages to which Hillcrest cites were submitted by New Life, the testimony contained in those pages does not create a genuine issue of material fact as to whether Hillcrest has "pursue[d] either Phase II or Phase III services set forth and outlined in the study" so as to incur the additional $150,000 fee under the agreement.  To the contrary, insofar as the testimony serves to dispute that point at all, it disputes whether Hillcrest has started installing a "pub and bistro" or a "marketplace"--and, as already noted, the court is not considering any recommendation by New Life that Hillcrest install a pub or bistro as a basis for entering summary judgment against Hillcrest.  See note 4, supra.

obligates Hillcrest to pay the additional $150,000 fee if it "pursues either so-called Phase II or Phase III services set forth and outlined in the <u>Study</u>," a term defined as New Life's "comprehensive assessment of Hillcrest's management, marketing and physical plant and . . . recommendations for improving [its] position within the marketplace, census and financial performance" (emphasis added).  This provision says nothing about Phase II or Phase III services set forth and outlined in the "Master Plan"--a document which, according to Hillcrest, did not even come into existence until June 2008, some nine months after the parties had entered into the August 2007 agreement.[11]  So, regardless of how the "Master Plan" defines Phase II and Phase III services (if at all), that definition has no effect on Hillcrest's obligation to pay the additional fee under the August 2007 contract.  That obligation, as just discussed, turns on whether Hillcrest has pursued Phase II or Phase III services as

---

[11]Hillcrest has simply attached a document entitled "Hillcrest Terrace:  Master Plan" to its summary judgment objection, without providing any further explanation--by way of Zaberiek's affidavit or otherwise--as to the origins of the document (which bears the name of what appears to be an architectural firm, rather than New Life).  Hillcrest does not argue, or provide any evidence, that the "Master Plan" amounted to a retroactive modification of the "Study" as defined by the August 2007 contract.

set forth and outlined in the Study.  There is no genuine dispute
that Hillcrest has done so.[12]

**C.   New Life did not materially breach the August 2007 agreement**

Hillcrest argues that, even if it has pursued Phase II or
Phase III services as set forth and outlined in New Life's study,
it nevertheless has no obligation to pay the additional fee
imposed by paragraph 8.2 of the August 2007 contract because New
Life's failure to deliver the promised "Project Deliverables"
constituted a material breach of the contract.  This argument
also fails.

"Not every breach of duty by one party to a contract
discharges the duty of performance of the other.  Only a breach
that is sufficiently material and important to justify ending the
whole transaction is a total breach that discharges the injured
party's duties."  Fitz v. Coutinho, 136 N.H. 721, 725 (1993)
(citation omitted).[13]  Although whether or not a party's actions

---

[12]There is also no dispute that Hillcrest did so within
three years of terminating the August 2007 agreement, as
modified, in March 2010.  Hillcrest does not argue to the
contrary (except insofar as it argues that the agreement was
mutually terminated, as just discussed at length).

[13]In light of this black-letter principle, Hillcrest is
wrong to suggest that it was discharged from its obligation to
pay the additional fee by any of New Life's "failure[s] without
legal excuse to perform any promise which forms the whole or part
of the" August 2007 contract.  Again, such a failure would
operate to relieve Hillcrest of its duties only if it rose to the

or inaction rise to the level of material breach often presents "a question for the trier of fact to determine," id., the court of appeals has held that "if the materiality question in a given case admits of only one reasonable answer (because the evidence on the point is either undisputed or sufficiently lopsided), then the court must intervene and address what is ordinarily a factual question as a question of law." Gibson v. City of Cranston, 37 F.3d 731, 736 (1st Cir. 1994) (applying Rhode Island law).  That is the case here.

Again, Hillcrest claims that New Life breached the August 2007 contract by failing to deliver certain of the promised "Project Deliverables."  There is no real dispute that New Life had yet to accomplish these tasks--at least as of February 2009, when both the parties agreed to reduce both the scope of New Life's responsibilities and the amount of its fees under the contract, as already discussed.  See Part III.A, supra.  As New Life points out, however, the August 2007 agreement did not require New Life to complete these tasks by February 2009 or, for that matter, by any particular time.  To the contrary, the

---

level of a material breach.  See Fitz, 136 N.H. at 721.  It bears repeating here that Hillcrest never even purported to notify New Life that it was in default under the contract and, even if Hillcrest had done so, New Life would have been entitled to an opportunity to cure any such default before Hillcrest was entitled to terminate the contract as a result.

agreement specifically states that "New Life shall be paid a monthly fee of $10,000 <u>until all Phase I deliverables have been achieved</u> or until such time as Hillcrest terminates this contract," capping the total fees at $200,000 (emphasis added).

Hillcrest does not identify any provision of the August 2007 agreement requiring New Life to complete the Project Deliverables by any specified time, let alone by February 2009.  Instead, Hillcrest invokes "the general rule that a contract lacking a designation of a specific time for performance obligates the parties to perform within a reasonable time."  Erin Food Servs., Inc. v. Derry Motel, Inc., 131 N.H. 353, 360 (1988).  But Hillcrest does not explain why a "reasonable time" for New Life to complete all of the Project Deliverables due under the contract would be February 2009--particularly where, as just noted, the contract states simply that New Life will receive $10,000 per month, to a maximum of $200,000, "until all Phase I deliverables have been achieved."  Indeed, the very existence of the cap shows that the parties contemplated, at the time they signed the contract, that achieving the Phase I deliverables could well take longer than 20 months.

Moreover, even if a rational factfinder could nevertheless conclude that a reasonable time for New Life to complete the Project Deliverables was fewer than 20 months, i.e., by February

2009, "[t]ime is generally not of the essence in a contract, unless the contract specifically so states, even if a particular time schedule is specified."[14]  Fitz, 136 N.H. at 725.  And, when time is not of the essence, a delay in one party's performance does not amount to a material breach so as to discharge the other party's duties.  See id.; Sawin v. Carr, 114 N.H. 462, 466 (1974).  Here, Hillcrest does not argue that time was of the essence under the August 2007 contract and, in fact, acknowledges that the contract "clearly did not contain a specific term for the completion of Phase I deliverables by New Life."  It follows that, even if that performance was due by February 2009 or earlier, as Hillcrest suggests, New Life's failure to meet that deadline did not, as a matter of law, amount to a material breach of the August 2007 contract.

---

[14]This rule disposes of Hillcrest's reliance on the schedule set forth in an unsigned and undated document that Zaberiek describes as "a Request for Proposal from local architectural firms with experience in the design of senior living communities prepared by New Life on Hillcrest's behalf late in 2007 or early in 2008."  While this document stated that Phase I of "[t]he project is currently scheduled" to include, among other things, "Approvals-June 2008," neither the document nor any testimony even remotely suggests that this statement reflected an agreement by New Life to obtain the approvals required as part of the Project Deliverables under the contract by that, or any date. But even if it did, a party's agreement to tender performance by a specific date does not itself mean that time is of the essence, as just noted.

Hillcrest also argues that one of the deliverables, obtaining a "Type A" license from the state, was simply unattainable:  as the parties learned some "eighteen months into the project," the state would not award such a license for "the conversion of the first floor of [its] nursing center because applicable Life Safety Rules did not allow for the renovation of [the center's] wood frame to house nursing home beds."  But Zaberiek acknowledges in his affidavit that this problem was not insurmountable--it just "resulted in [Hillcrest's] need to change [its] plans to include an addition onto [its] existing building to house the new nursing home beds."  By Zaberiek's own admission, then, obtaining the Type A license was not impossible, but merely more time-consuming and costly than the parties had originally anticipated.  Hillcrest does not explain how this development amounts to New Life's material breach of the August 2007 agreement.

Hillcrest's real complaint seems to be that, despite New Life's three-step plan for improving Hillcrest's financial condition, "the failure to obtain the life care contracts required to . . . reduce Hillcrest's debt and provide cash," which was envisioned as part of Phase I, left Hillcrest without the funds necessary to embark on Phases II and III.  In fact, the lack of those contracts--combined with a generalized slowdown in

the economy--produced a downturn in Hillcrest's financial
condition.  But, as already noted, Hillcrest has pointed to
nothing in the August 2007 agreement that obligated New Life to
obtain additional contracts, see note 5 and accompanying text,
supra, let alone guaranteed that working with New Life would
improve Hillcrest's financial position.  Naturally, Hillcrest
expected that sort of positive result from its dealings with New
Life, but that is the expectation inherent in virtually every
commercial relationship, i.e., to make money.  This court is not
aware of any principle of contract law that discharges one party
from its obligations under an agreement simply because that
agreement fails to produce the financial gain the parties had
anticipated when they entered into it--unless, of course, the
contract specifically provides for that result.  The contract
here did not, and "courts cannot make better agreements than the
parties themselves entered into or rewrite contracts merely
because they might operate harshly or inequitably." Livingston
v. 18 Mile Point Drive, Ltd., 158 N.H. 619, 623-24 (2009).
Hillcrest has not come forward with any evidence of New Life's
material breach of the August 2007 contract, as written.

## V.   <u>Conclusion</u>

To recapitulate, the undisputed evidence of record conclusively establishes that (A) Hillcrest terminated the August 2007 agreement, (B) within three years of doing so, Hillcrest pursued at least some of the Phase II or Phase III services set forth and outlined in the Study, as that term is defined in the agreement, and (C) New Life did not materially breach the agreement.  New Life is therefore entitled to summary judgment on its claim that Hillcrest breached the agreement by failing to pay the additional $150,000 fee.  The plaintiffs' motion for summary judgment[15] is granted.  The clerk shall enter judgment in favor of New Life and close the case.

**SO ORDERED.**

_____
Joseph N. Laplante
United States District Judge

Dated:  June 22, 2012

cc:  Christian J. Jorgensen, Esq.
     Daniel C. Proctor, Esq.
     James C. Wheat, Esq.

---

[15]Document no. 14.